**[Cite as *State v. Brown*, 2025-Ohio-1079.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30127 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 02357 |
| | : | |
| MELVIN BROWN | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 28, 2025

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Melvin Brown appeals from his convictions on two counts of felonious assault, two counts of kidnapping, four counts of rape, one count of having a weapon while under disability, one count of evidence tampering, a repeat-violent-offender specification, and a firearm specification.

{¶ 2} The charges against Brown involved the kidnapping, assault, and rape of the victim, D.K., over a period of hours. The trial court found him guilty following a bench trial and imposed an aggregate sentence of 46 to 51.5 years in prison.

{¶ 3} In six assignments of error, Brown (1) alleges a due-process violation based on the State's failure to preserve bloody items recovered from the scene of the initial kidnapping, (2) claims prosecutorial misconduct based on the State's failure to disclose the victim's cell-phone records or the identity of her service provider, (3) challenges the trial court's admission of testimony about the victim's bloody wallet and phone, (4) alleges ineffective assistance of trial counsel, (5) challenges the weight of the evidence to sustain his convictions, and (6) argues that his convictions were not supported by legally sufficient evidence.

{¶ 4} For the reasons set forth below, we find Brown's assignments of error to be unpersuasive. Accordingly, the trial court's judgment will be affirmed.

## I. Background

{¶ 5} D.K. testified at trial that she spent the evening of June 10, 2022, at a bar drinking with friends. After leaving the bar in the early-morning hours of June 11, 2022, she was driven to a friend's house in Dayton. Around 3:30 a.m., D.K. left her friend's house and began walking home. As she walked south on Smithville Road near a fire station, an unknown man accosted her, put a handgun to her head, and demanded sex. When she resisted, the assailant struck her with the gun, shot her in the thigh, and forced her into the front seat of a red GMC pick-up truck. D.K. tried to grab the steering wheel as the man drove away, but he struck her in the face, causing her to lose consciousness.

He transported her to an empty field where he removed her clothes, performed multiple sex acts on her, and threatened to kill her. The perpetrator eventually dragged D.K. to the side of the truck and raped her again. He then drove her to an apartment building where a younger male helped move her inside a studio apartment. The perpetrator forced D.K. to bathe before discarding her clothes and giving her a shirt and shorts. The two men then put her back in the truck, and the trio drove around while discussing what to do with her. The men ultimately stopped in front of an abandoned house, removed D.K. from the truck, and drove away. After they departed, she signaled to a female pedestrian who called the police. D.K. was transported to a hospital and began receiving treatment for her injuries, which included a broken femur, broken teeth, and lacerations to her head and lips. Several parts of D.K.'s body also were swabbed for DNA evidence.

{¶ 6} On the morning of June 11, 2022, D.K.'s friends began looking for her. One of them found her bloody wallet in the middle of Smithville Road near the fire station. Police began searching the area and found one of D.K.'s shoes and her bloody cell phone near a tree line. Although police initially retained the phone, it was too damaged for any information to be retrieved. Investigators determined that the owner of the red GMC pick-up truck had loaned it to someone who in turn had loaned it to Brown.

{¶ 7} D.K. claimed not to have known her attacker and could not identify a picture of him. However, a vaginal swab revealed the presence of sperm cells in her vagina, and DNA testing of those cells was consistent with Brown being the contributor. A DNA analyst with the Ohio Bureau of Criminal Investigations testified that the DNA profile extracted from the sperm cells would be found in less than one in one trillion people. The

analyst further testified that a DNA profile obtained from a swab of D.K.'s right nipple was consistent with contributions from D.K. and Brown. The profile that was consistent with Brown's would be found in one in 100 billion people. The analysis also found a DNA profile consistent with Brown's in a blood sample in the truck. The frequency of occurrence of that DNA profile was less than one in one trillion people. Finally, the analyst found a DNA profile consistent with D.K.'s in a separate blood sample in the truck. The frequency of occurrence of that DNA profile was less than one in 20 million people.

{¶ 8} Brown's theory at trial was that D.K.'s testimony was unreliable and that the DNA evidence could be explained. Regarding D.K.'s testimony, defense counsel noted her inability to identify her attacker despite having spent several hours with him. The defense also alleged inconsistencies in her story and argued that her memory of events implausibly seemed to improve as time passed after the incident. The defense further asserted that Brown and D.K. were acquaintances who had engaged in sexual activity the night before the attack, thereby explaining the presence of his DNA.

{¶ 9} Based on the evidence presented, the trial court found Brown guilty on all charges and specifications. After merging allied offenses of similar import and related specifications, the trial court sentenced him on the charges and specifications set forth above. This appeal followed.

## II. Analysis

{¶ 10} Brown's first assignment of error states:

BROWN'S CONSTITUTIONAL RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE STATE FAILED TO PRESERVE EXCULPATORY

EVIDENCE AND/OR DESTROYED THE EVIDENCE IN BAD FAITH.

{¶ 11} Brown asserts that D.K.'s wallet and cell phone, which were found at the scene of her initial kidnapping on Smithville Road, had apparent blood on them. He claims these items constituted exculpatory evidence that the State improperly returned to her shortly after the incident. He argues that DNA testing of the blood on the wallet and cell phone would have precluded him from being her assailant or would have helped "narrow down the suspect."

{¶ 12} At a minimum, Brown argues that the two pieces of evidence were potentially useful and that the State acted in bad faith by returning them to D.K. He maintains there was at least a chance that DNA testing of the blood would have eliminated him as a suspect or helped identify an alternative suspect. To demonstrate bad faith, he cites a police officer's recognition at trial that bloody evidence can be important when an assailant's identity is unknown. He also asserts that prior to trial the State was ordered to make the wallet and cell phone available to the defense for inspection. Brown contends there is no record of the State's compliance with this order, thereby evidencing bad faith.

{¶ 13} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the State either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence." *State v. McClain*, 2016-Ohio-838, ¶ 21 (2d Dist.), citing *State v. White*, 2015-Ohio-3512, ¶ 58 (2d Dist.). "Evidence is 'materially exculpatory' if it (1) possesses 'an exculpatory value that was apparent before the evidence was destroyed' and (2) is 'of such a nature that the defendant would be unable to obtain comparable evidence by other

reasonably available means.' " *Id.*, citing *California v. Trombetta*, 467 U.S. 479, 489, (1984); *State v. Powell*, 2012-Ohio-2577, ¶ 74.

{¶ 14} "In contrast, evidence is not materially exculpatory if it is merely potentially useful." *State v. Cox*, 2013-Ohio-4941, ¶ 88 (2d Dist.). "Potentially useful" evidence "may or may not have incriminated the defendant. The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith." *Id.* Bad faith "implies something more than bad judgment or negligence." *Powell* at ¶ 81. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.*

{¶ 15} D.K.'s wallet and cell phone were not materially exculpatory evidence. If they had been preserved, an examination might or might not have shown the presence of Brown's DNA. Moreover, even if his DNA was absent, that would have proven only that he did not bleed on the items or deposit any DNA on them. It would not have established that he did not kidnap, assault, or rape D.K.

{¶ 16} Even if the wallet and cell phone were potentially useful to the defense, we see no evidence of bad faith. Police returned the items to D.K. at her request a week or so after the incident. She wanted her wallet back because it contained her bank cards. She also requested her phone, from which investigators had been unable to extract any information. Nothing suggests that returning the wallet and cell phone to D.K. constituted more than poor judgment or negligence at worst.

{¶ 17} We note too that Brown complains about being deprived of an opportunity

to conduct DNA testing of apparent blood on the wallet and cell phone. But investigators did retain D.K.'s bloody cell-phone case. *See* Trial Transcript Vol. I at 98. The prosecutor marked the case as an exhibit, and D.K. identified it at trial. *Id.* Brown presumably could have pursued DNA testing of the blood on the case if he perceived it as exculpatory or potentially useful to his defense. Finally, we reject his bad-faith argument based on the prosecutor's alleged non-compliance with a court order to make D.K.'s cell phone and wallet available for inspection. When the trial court issued its pretrial order, the items no longer were under the State's control. In any event, the record is silent as to whether the State made them available to the defense. We will not infer bad faith under these circumstances. For the foregoing reasons, the first assignment of error is overruled.

{¶ 18} Brown's second assignment of error states:

THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT BY FAILING TO DISCLOSE MATERIAL EVIDENCE TO THE DEFENSE.

{¶ 19} Brown contends the State engaged in prosecutorial misconduct by violating *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose D.K.'s phone records or the identity of her service provider.

{¶ 20} The records issue arose during a status hearing held three months before trial. At that November 28, 2023 hearing, Brown's prior defense counsel acknowledged that D.K.'s cell phone had been broken. Counsel nevertheless desired her phone records, which apparently were not in the State's possession. Defense counsel offered to subpoena the records from the cell-phone carrier himself if the prosecutor would provide the name of D.K.'s service provider. The prosecutor agreed to get the information from

D.K.

**{¶ 21}** On appeal, Brown contends the record is silent as to whether the prosecutor ever gave defense counsel the service provider's name. He also argues that the prosecutor engaged in misconduct by failing to provide him with the actual records despite a court order to do so. We find Brown's argument to be unpersuasive. As he acknowledges, the record does not reveal whether the prosecutor ever gave his prior counsel the name of D.K.'s service provider. We decline to infer prosecutorial misconduct from a silent record. It may be that the prosecutor did provide the information to prior defense counsel, who neglected to supply it to Brown's subsequent trial counsel. Moreover, the prosecutor represented during trial that the defense in fact had received the identity of the service provider as part of discovery. The prosecutor cited a discovery video on which D.K. apparently revealed her phone number and service provider to police. Brown's counsel did not deny this assertion.

**{¶ 22}** Finally, contrary to Brown's argument, the trial court did not order the prosecutor to turn over the actual phone records. During the status hearing on which Brown relies, the trial court offered to issue an order requiring the victim to disclose her service provider's identity. *See* Nov. 28, 2023 Transcript at 3-4. Instead, the prosecutor offered to get the information and to provide it to defense counsel, who indicated that he would subpoena the records directly himself. Based on our review of the record, we see no prosecutorial misconduct. The second assignment of error is overruled.

**{¶ 23}** Brown's third assignment of error states:

THE TRIAL COURT ERRED IN ADMITTING EVIDENCE ABOUT THE

EXISTENCE AND DISCOVERY OF D.K.'S BLOODY WALLET AND PHONE FROM THE SCENE OF THE ALLEGED INCIDENT.

{¶ 24} Brown challenges the admission of testimony about the victim's bloody wallet and cell phone being discovered near the scene of her kidnapping. He contends the testimony should have been excluded because the items were returned to D.K. before he could examine them. He also asserts that the wallet was not authenticated and that there was no way of knowing whose blood was on it.

{¶ 25} The admission of testimony about the wallet and phone was the subject of a pretrial motion in limine filed by Brown. During a February 7, 2024 hearing on the motion, the State represented that Dayton police officers and a firefighter had gone to the crime scene and retrieved the wallet and cell phone, which later were returned to D.K. In response, defense counsel objected that what appeared to be blood on the items had not been tested. The prosecutor countered that law-enforcement officers or firefighters could testify about seeing what appeared to be blood on the items. The trial court tentatively rejected the State's argument and preliminarily precluded testimony about blood on the wallet and cell phone while also ordering those items to be made available to the defense for examination. *See* Feb. 7, 2024 Trial Transcript at 9-11.

{¶ 26} On appeal, Brown contends the record is silent as to whether the wallet and cell phone ever were made available for the defense to examine. Once again, however, we cannot infer from a silent record that the items were not made available. We note too that D.K. herself testified about retrieving her wallet, cell phone, keys, and a shoe from the police department about a week after the incident. As the trier of fact, the trial court

reasonably could have inferred from D.K.'s testimony that the items collected at the crime scene in fact belonged to her and that she had lost them when she was kidnapped.

{¶ 27} Regarding testimony about blood on the wallet and cell phone, which was the primary focus of the motion in limine, Brown complains that three law-enforcement officers testified at trial about seeing what appeared to be blood on D.K.'s wallet and cell phone. The State counters that Brown waived this issue by not objecting when it arose at trial. We need not dwell on the absence of a contemporaneous objection, however, because we see nothing improper about the testimony. A police officer may provide opinion testimony, based on first-hand perceptions as a lay witness, that a substance on an item appeared to be blood. *State v. Hopfer*, 112 Ohio App.3d 521, 555-556 (2d Dist. 1996). An officer's inability to state with scientific certainty that the substance was blood goes to the weight of the testimony, not its admissibility. *Id.* Finally, we fail to see how Brown could have been prejudiced in his bench trial by the trial court's hearing about apparent blood being seen on D.K.'s wallet and cell phone. Given that she undeniably had been shot in the femur, the presence of blood on her belongings could not have been surprising. For the foregoing reasons, the third assignment of error is overruled.

{¶ 28} Brown's fourth assignment of error states:

BROWN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 29} Brown alleges ineffective assistance of counsel based on his attorney's failure to (1) subpoena records from a Roadway Inn and a Budget Inn, (2) subpoena D.K.'s phone records, (3) subpoena records of D.K.'s boyfriend's jailhouse phone calls, and (4) request a continuance or a mistrial.

{¶ 30} We review ineffective-assistance claims under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Ohio Supreme Court in *State v. Bradley*, 42 Ohio St.3d 136 (1989). To prevail, a defendant must show that trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. Deficient performance is conduct that falls below an objective standard of reasonable representation. *Strickland* at 688. Prejudice exists when there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

{¶ 31} In his first three arguments, Brown addresses defense counsel's failure to subpoena certain records. He first argues ineffective assistance of counsel based on his attorney's failure to subpoena records from two hotels. Although Brown did not testify at trial, his attorney attempted to explain the DNA evidence by suggesting that Brown and D.K. knew each other, that she voluntarily had been in his red truck, and that they had engaged in consensual sexual conduct. To support this argument, Brown asserts that his attorney should have subpoenaed records from a Roadway Inn for May 2022 and from a Budget Inn for June 10, 2022. Brown argues that he first stayed with D.K. at the Roadway Inn in May 2022. He maintains that he also slept with her at the Budget Inn on Dorothy Lane on June 10, 2022, the day before she was kidnapped, shot, and raped. Brown

argues that the Budget Inn records would have explained the presence of his DNA inside of D.K.'s vagina and on her nipple.

**{¶ 32}** Brown next alleges ineffective assistance based on his attorney's failure to subpoena D.K.'s phone records. He argues that the records may have included useful location data showing whether she had been in the vicinity of the two hotels in May 2022 and on June 10, 2022. According to Brown, location data also might have revealed whether D.K. and Brown were moving in the same direction when she was kidnapped. Brown additionally alleges ineffective assistance based on his attorney's failure to subpoena records of D.K.'s boyfriend's phone calls from jail. D.K.'s boyfriend was in jail when she was kidnapped, shot, and raped. Brown theorizes that D.K. may have had conversations with her boyfriend about the incident and that those conversations may have been favorable to his defense.

**{¶ 33}** Upon review, we see no ineffective assistance stemming from defense counsel's failure to subpoena the foregoing records. Regarding the hotel records, Brown concedes on appeal that defense counsel in fact did subpoena the Roadway Inn records for the entire year of 2022 and that they contained nothing relevant. As for the Budget Inn on June 10, 2022, he claims defense counsel erroneously obtained records from a Budget Inn on Miller Lane (which apparently showed nothing) rather than a Budget Inn on Dorothy Lane. Prior to trial, however, Brown claimed to have met the victim at a Motel 6 on Miller Lane on June 10, 2022, not a Budget Inn. In any event, he cannot establish ineffective assistance of counsel because we do not know what the June 10, 2022 hotel records for the Budget Inn on Dorothy Lane would have shown. Like the other hotel records, those

records also might have revealed nothing relevant. "A claim of ineffective assistance of counsel cannot be raised on direct appeal if it relies on evidence outside the record." *State v. Kinney*, 2024-Ohio-5025, ¶ 10 (2d Dist.).

**{¶ 34}** We reach the same conclusion regarding defense counsel's failure to subpoena D.K.'s cell phone records or her boyfriend's jailhouse phone records. Because those records were not obtained and made part of the record, Brown's argument is speculative. We have no way of knowing whether they would have been beneficial to him. That being so, he cannot establish prejudice on direct appeal for purposes of an ineffective-assistance claim.

**{¶ 35}** Finally, Brown alleges ineffective assistance based on his attorney's failure to request a continuance or a mistrial to enable him to obtain D.K.'s phone records and the hotel records. Once again, however, Brown cannot establish prejudice because we do not know what the phone records or hotel records would have shown. As the State points out, the records might not have helped him. Indeed, the hotel records may have harmed his case by proving that he did not get a room with D.K. As a matter of trial strategy, defense counsel reasonably could have elected not to seek records for the Budget Inn on Dorothy Lane, particularly after the other hotel records established nothing useful. As a result, we see no ineffective assistance of counsel in failing to seek a continuance or a mistrial. The fourth assignment of error is overruled.

**{¶ 36}** Brown's fifth and sixth assignments of error state:

BROWN'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF

THE EVIDENCE.

BROWN'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶ 37}** Brown's final two assignments of error challenge the legal sufficiency and manifest weight of the evidence to sustain his convictions. The legal-sufficiency argument focuses on the State's proof of his identity as D.K.'s assailant. He stresses her failure to identify a photograph of him. Although he did not testify at trial, he also cites his claim in a motion in limine that he had sex with D.K. at a Motel 6 on Miller Lane on June 10, 2022, thereby explaining the DNA evidence. Alternatively, he argues that his DNA should not have been found on swabs of the victim because she claimed the perpetrator had bathed her in water mixed with detergent and bleach. As for D.K.'s DNA being found in the truck he was driving, Brown notes that it was unknown when her DNA got in the truck.

**{¶ 38}** As for the manifest weight of the evidence, Brown challenges the credibility of D.K.'s testimony. He questions how she could not identify her assailant despite spending hours with him at close range. Although D.K. never identified him as the perpetrator, he also questions how her memory of the incident could have gotten better as time passed. Brown additionally questions how D.K. could have been shot and forced into a truck on Smithville Road without anyone seeing, hearing, or recording the incident. Brown admits that his DNA was found in D.K.'s vagina and on her nipple. He maintains, however, that he had sex with her at the Motel 6 on Miller Lane the day before the incident. He also reiterates his claim that no DNA would have been found if the victim was washed as she claimed. Finally, Brown contends D.K. had a motive to lie about not knowing him to protect her reputation.

{¶ 39} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 40} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 41} With the foregoing standards in mind, we reject Brown's legal-sufficiency and manifest-weight challenges. D.K.'s testimony about being kidnapped, shot, and repeatedly raped combined with the DNA evidence was legally sufficient to support his convictions. As noted above, Brown's argument challenges the State's proof that he was the perpetrator. Notably, however, Brown concedes that his DNA was found in the victim's

vagina and on her nipple. He also concedes that her DNA was found in the truck he was driving. As the trier of fact, the trial court was entitled to credit D.K.'s testimony that she did not know Brown and had not met him previously. D.K.'s testimony and the DNA evidence, if believed, were legally sufficient to establish that Brown was the person who kidnapped, shot, and repeatedly raped D.K.

{¶ 42} We reach the same conclusion regarding the weight of the evidence. D.K. testified that her memory of events did improve after she received treatment and after the initial shock and trauma subsided. Although she never identified Brown as her assailant, the DNA evidence strongly pointed to his guilt. Her DNA was found in his truck, and his DNA was found in and on her body. The trial court was not required to accept defense counsel's assertion that Brown and the victim had engaged in consensual sexual conduct the day before she was attacked. The record also supported D.K.'s testimony that she was shot and forced into a truck on Smithville Road. Although no one reported seeing or hearing the incident, her phone, wallet, and shoe were found in the area where she claimed to have been kidnapped.

{¶ 43} Ultimately, the State's case rested on the DNA evidence and D.K.'s claim that she did not know Brown and never had engaged in sexual activity with him before. The trial court was entitled to credit D.K.'s testimony, which when combined with the evidence of her DNA in Brown's truck and Brown's DNA in and on her body effectively proved his guilt. Based on our review of the record, we cannot say the trial court clearly lost its way and created such a manifest miscarriage of justice that Brown's convictions must be reversed. This is not an exceptional case in which the evidence weighed heavily

against his convictions. The fifth and sixth assignments of error are overruled.

## III. Conclusion

**{¶ 44}** The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and HUFFMAN, J., concur.